Filed 5/30/24  In re Al.G. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Al.G. et al., Persons Coming Under the Juvenile Court Law. | B319877 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.G.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 20CCJP03767A–C |

APPEAL from orders of the Superior Court of Los Angeles County, Kristen Byrdsong, Juvenile Court Referee. Affirmed.

Pamela Rae Tripp for Defendant and Appellant.

Freeman Mathis & Gary, Christian E. Foy Nagy, and Chris Fleissner, for Plaintiff and Respondent.

# INTRODUCTION

M.G. (father) appeals the juvenile court's orders finding jurisdiction over his three children, Al.G., An.G., and O.G., under Welfare and Institutions Code,[1] section 300, subdivisions (b), (c), (d), and (j), and terminating the case with a juvenile custody award. The court's orders followed a heavily litigated, year-long trial. Father contends that the court improperly found the children's testimony credible in light of evidence he presented of mother's ongoing alienation of the children. He also contends that the court inappropriately limited the evidence he could present at trial and demonstrated bias in its rulings. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Father and S.G. (mother) married in 2004. Al.G. was born in December 2007 and the twins An.G. and O.G. were born in April 2009. The parents divorced in 2009. Custody proceedings have been ongoing since that time and could fairly be described as contentious.

## 1. Prior Child Welfare History

Between 2011 and 2017, the Los Angeles Department of Children and Family Services (the Department) received 11 referrals in which it was alleged that the children were the victims of physical abuse, emotional abuse, or general neglect. Eight of the referrals alleged abuse by father and three alleged abuse by mother. Father's alleged conduct included throwing O.G. into a cold pool as punishment, allowing the children to ride

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

in the front seat of the car without a car seat, hair pulling, and pushing. The Department determined that five of the referrals alleging abuse by father were unfounded, one was inconclusive, and two were evaluated out. It concluded that one of the prior referrals alleging abuse by mother was unfounded, one was inconclusive, and the remaining allegation was evaluated out.

## 2. Original Petition

On July 15, 2020, the Department filed a petition asserting allegations against mother and father under section 300, subdivisions (a), (b), (c), (d), and (j). Count a-1 alleged that, on June 4, 2020, father "physically abused the child [Al.G.] by forcefully putting his hands on the child's body by tackling the child against the gate, causing the child to fall to the ground and lose consciousness." Count a-2 alleged that father abused An.G. and O.G. by hitting and punching them, pulling their hair and ears, and throwing them against the wall. Counts a-1 and a-2 alleged that mother was aware of the physical abuse by father and failed to protect the children.

Counts b-1 and b-2 described the same conduct by father as counts a-1 and a-2. Count b-3 alleged that father was an abuser of alcohol and marijuana and was under the influence of these substances while the children were under his care and supervision. Count b-4 alleged that father created a detrimental and endangering home environment by forcing the children to drink alcohol and smoke, withholding food and charging the children for water, and because he allowed a female companion who was an abuser of alcohol and marijuana to reside in the home with the children. Count b-5 alleged that father drove a car while under the influence while the children were passengers. Counts b-6 through b-8 alleged that father sexually abused the

3

children by fondling their nipples and crotch area and kissing and blowing on their stomachs. With respect to each count, the Department also alleged that mother failed to protect the children.

Counts c-1 through c-3 alleged that father emotionally abused the children by physically and sexually abusing them, withholding food, and making audio and video recordings of them. The Department alleged that the children had expressed thoughts of self-harm due to father's conduct. It also alleged with respect to each count that mother had failed to protect the children.

Counts d-1 through d-3 alleged that father sexually abused the children by fondling their nipples and crotch area and kissing and blowing on their stomachs and that mother failed to protect the children.

Counts j-1 through j-5 repeated the prior allegations of father's physical and sexual abuse of the children and of mother's failure to protect.

### 3. Detention Report

On June 15, 2020, the Department received an emergency response referral after mother and Al.G. went to the Santa Monica Police Department. Al.G. reported an incident in which father pinned him against a wall and tackled him to the ground. During the incident, father called Al.G. " 'wussy' and 'pussy.' "

Two days later, a social worker, Edda Figueroa, received a phone call from father informing her that an officer had closed the police investigation as " 'unfounded' " after father had provided photos and videos. Father told her that she should also close the Department's investigation. Later that day, Figueroa spoke with Officer Benjamin Jenkins, who stated that the

4

incident was " 'unfounded' " because there was a video showing that father grabbed Al.G. by the shoulder and Al.G. slipped. Father only stumbled but remained standing the whole time. Officer Jenkins stated that father denied falling on top of the child, tackling him, yelling at him, hitting him, or any other form of abuse and neglect and reported that the children were not in danger and that the police had no concerns of abuse and neglect. Officer Jenkins stated that "it appears as if the parents have had a bad divorce and the children are in the middle of it."

On June 24, 2020, Figueroa made initial contact with the children at mother's house. Figueroa did not observe any physical signs of abuse or neglect. Al.G., who was then 12 years old, told Figueroa that father is a bad person. Father made the children go on far walks and, if they refused, they would not receive dinner. Al.G. stated that father had made him go on a long walk on June 4. Father reportedly stated, "you either use your walk free pass or 'I smack your butt free pass.' " Al.G. replied that he wanted to skip the walk. Father told him he would not receive dinner if he did so. Al.G. agreed to go. Father then " 'tackled him against the gate and they both fell to the ground and he went unconscious for 5-10 seconds.' " Al.G. then got up and tried to move away from father because he was scared. Father started recording Al.G. "to make himself look good as if [he] hadn't hurt [Al.G.]." Al.G. reported that father cursed at him and called him "a 'fucking wussy and fucking pussy.' "

Since the incident, Al.G. had not returned to father's house. He did not feel safe with father. Al.G. reported that there was "no food" at father's house because father is " 'obsessed with their weight' " and that he would go to bed hungry at father's house. Father would make fun of their weight and would deny them food

if they weighed a certain amount. He reported that they went on a boat ride and father ordered insufficient food for the children and kept calling Al.G. " 'fat pregnant bitch.' " Al.G. stated that father disciplines the children by yelling, hitting, punching, taking away electronics, and taking away food. He felt sad and depressed every time he was at father's house and did not want to go back "because he has a plan to hurt himself . . . by 'grabbing a knife and cutting his neck.' " Al.G. had never hurt himself before but wanted to while at father's house. He reported "he would jump from the second-floor stairs towards the floor." He stated that he did not feel like hurting himself while at mother's house.

Al.G. also reported that father made the children do " 'belly time,' " during which they would " 'lay flat in the bed with their hands behind their back and lift their shirt while the father put his mouth to their stomach and kisses it and blows air.' "[2] Al.G. stated that father sometimes went lower than his stomach but denied that father " 'kiss[ed] his penis.' " He stated that belly time made him uncomfortable. Father would also do something called " 'cherry-picking,' " which involved father " 'putting his hands around [Al.G.'s] groin and . . . lift[ing] him from there.' " During this, Al.G. could feel father "touching, rubbing, and pressuring his private parts." Al.G. was afraid to go back to father's after reporting everything that happened because "at the other times when he or his sibling tried to explain how bad their situation was at their father's, he gets 'extremely pissed off.' "

---

[2] Although it was referred to by various names in the Department's reports, the family consistently referred to this conduct as "belly meat" in their testimony. We refer to it by this name henceforth.

Figueroa also interviewed An.G., who was then 11 years old. She did not observe any visible signs of abuse or neglect. With respect to the incident on June 4, An.G. stated that father told the children they must either go on a walk or they would not receive dinner. When they were walking out of the house, father tackled Al.G. against the gate and they both fell to the ground. Father fell on top of Al.G. and said, " 'you rude bitch, you fucking weezy [*sic*] and pussy.' " An.G. was so scared that he froze and watched. Al.G. started to cry.

An.G. was afraid of father and did not feel safe going back to his house because he was afraid father would hurt him. An.G. reported that father disciplines him by making him run at least two miles. One time, father said " 'either I punch you for real or you won't go to your friend's party.' " Another time, An.G. did not greet father quickly enough and father threw him against the wall. He reported that sometimes there was no food for them at father's house. If father learned that they had spoken to mother, he would make them " 'skip a meal.' "

An.G. informed the social worker that father had put his hand on An.G.'s butt after taking off his shorts and underwear. He did not remember how long ago it happened. He also described " 'belly him time', " during which father "puts his face on [An.G.'s] belly and kisses it and blows air and then he turns him around and touches his butt." He also reported that father " 'touched his penis' " when doing " 'cherry-picking,' " which he described as "when the father grabs him in between his legs and hip and lifts him." When father did that, An.G. felt "that his father is touching his private parts and when the father releases his hands he always 'goes over his penis area.' " An.G. denied that father made him do anything else of a sexual nature.

An.G. felt sad and depressed when he saw father hurt Al.G. He stated that he wanted to hurt himself when at father's house and wanted " 'to grab a knife and cut his neck with it.' " He had gotten close to doing so before. He denied any plan to hurt himself at mother's house, where he felt safe.

Figueroa also spoke with O.G., also 11 years old. O.G. reported that, on June 4, father wanted them to take a walk towards the beach and that he did not wish to go because they were walking towards protests and he didn't feel safe. Al.G. had won a " 'free walk pass' " and asked if he could use it but father did not let him. Everyone started walking and then O.G. saw father " 'tackle [Al.G.] against the fence and falling to the floor.' " He reported that father said: " 'excuse me you don't get to talk to me like that you weeze [*sic*], fucking bitch.' "

O.G. stated that he did not like to be around father because he never knew what would happen. He did not feel safe with father and did not want to go back to his house. O.G. reported that father once made him run two miles at night because O.G. did not put on his pajamas fast enough. He also hit O.G. and his brothers, threw them against the wall, and held their faces against the wall. O.G. stated that he "usually cries at dinner time and he is always super scared of father." He had suicidal thoughts about going to father's house, although he never had a plan of how to hurt himself. O.G. had nightmares that "father will come to get him from his mother's home; kidnap him and then put him and his siblings in bags; put in a car and throw them somewhere else far away."

Following the June 4 incident, mother took Al.G. to the police "per [his] request" and stopped the visitations with father. She denied seeing any marks or bruises on the children but

8

stated that the children reported father's "extreme[]" discipline of them and were scared of father and did not want to return to his house. The children told her they would hurt themselves if they went back. She denied knowing how the children's rejection of father started.

The following day, Figueroa had contact with father, who stated "to complete a visit with him at his home, that he needed to know . . . what his children reported." Figueroa told him the discussions were confidential. Father reported that he was going to email her "various files and that he 'expected' [her] to have read them." He urged her to close the referral by " 'sometime next week' " because he had a pending court hearing regarding custody. He also "expected [her] to use law enforcement's information to complete her investigation." Father later sent her an email attaching the police report and declarations from himself and his wife, Am.G. (stepmother), about the June 4 incident.

Zophia Barrera, a social worker who had interacted with the family in 2017, stated that the parents were going through a custody battle and that An.G. and O.G. were afraid of father. Father was difficult to work with and was upset that she had to complete a home assessment. Father recorded her and "was 'trying to control her through the investigation' and . . . wanted to go above the law." Barrera also stated that "mother plays 'the victim' and might influence the children emotionally."

Figueroa also contacted Alexis Garcia, who provided therapy to Al.G. first in a group counseling setting through his middle school and then on an individual basis. Garcia stated that father was "difficult to work with" and "didn't want to approve the therapy session." Al.G. told her that " 'there are things that

9

happen to him and his siblings but no one believes us.' " He had spoken up sometime in 2017 with the Department and "got the 'worse consequences.' " He told her he was "hopeful and the next time he and his siblings speak up that someone believes him and takes him seriously, even though 'he knows that his father always gets in his way.' "

Al.G. also told her that father always made fun of his weight and was "always controlling his privacy." Garcia disclosed that father has cameras everywhere in his house. Father was " 'very interesting to interact with' "; "always tries to manipulate her"; and "was 'verbally aggressive and controlling towards her.' " Al.G. had a therapy session at father's house and "disclosed that he couldn't talk to her 'normally' . . . because his father was recording him." Garcia was concerned that father was abusing and neglecting Al.G. but lacked evidence.

Figueroa also completed a call with father, father's attorney, and county counsel. Father read from a declaration. He stated that, on June 4, he asked the children to take a walk to thank the National Guard and police. When he asked the children to get ready to go, Al.G. grew "very belligerent," said no, and said "he wanted to 'smack [father's] ass' in exchange for coming." Father said no. Al.G. walked out and father followed him. He tried to put his hand lovingly on Al.G.'s shoulders when Al.G. slipped and they both almost fell. Father told Al.G. "you can't say you are going to hit me." He told Al.G. to get up. "No one was hurt. No one hit anyone."

Father stated that he disciplines with "positive parenting." He would sometimes make the children run a quarter mile on the treadmill. He denied physically disciplining the children. The last time he weighed them was two or three months prior. He

10

expressed concerns about the children's mental health because he believed they were "suffering from a lot of pressure from the mother saying, 'bad things about him.' " He stated that belly meat happened when the children were younger and consisted of " 'blowing air on their stomach.' " He had not done it for over a year. Cherry-picking was a wrestling move. He denied doing it to the children and said they did it amongst themselves. Father denied any drug or alcohol consumption. He stated that he is an upstanding citizen and that "mother has created all the allegations and there [*sic*] are not true."

Father's housekeeper stated that the children were treated " 'well' " by father. She had worked for mother for approximately three months and stated that mother was "aggressive" and she was scared of her. The housekeeper said father's house had rules and schedules and that mother let the children do whatever they wanted.

Stepmother, who was present on June 4, stated that "[Al.G.] was at no moment 'physically injured.' " Al.G. was being disrespectful to father, father put a hand on his shoulder, and Al.G. fell back. Stepmother stated that father would discipline the children by talking to them or sending them to their rooms. She denied any yelling, physical punishment, or restriction of food or water.

On July 10, 2020, Figueroa had a follow-up meeting with the children, who asked to speak to her together. The children reported that they were scared to go back to father's house and did not feel safe with him. Al.G. was scared of father doing " 'preparation' " to him, which was when "father 'rubs his nipples and stomach in a circular motion while father sat on his legs.' " He described preparation as a "preparation to 'belly me[at].' "

Al.G. stated that he had to agree to preparation, belly meat, and cherry-picking so father would "give him 'extra food or allow him to skip weighing.' " An.G. and O.G. each stated that belly meat and preparation happened on a daily basis at father's house, while cherry-picking took place less frequently. An.G. also reported that, the last time the children spoke with a social worker in 2017, father put them in separate rooms, asked them many questions, and threatened to deny them food if they did not answer.

The Department recommended that the children be removed from their father's care and placed with mother.

### 4.  Detention Hearing

On July 20, 2020, the court held the detention hearing and concluded that a prima facie case existed that the children were persons described by section 300. It concluded that reasonable efforts had been provided to prevent removal and that there were no services available to prevent the children's detention from father. The court released the children to mother's home. It ordered monitored visitation for father in a therapeutic setting.

### 5.  Last Minute Information

In a last minute information filed in September 2020, the Department reported that it had attempted to facilitate therapeutic visits between the children and father. Dr. Lynn Steinberg had agreed to facilitate visits at her office, but the children refused to attend, even when social worker Steve Garza came to transport them. Without meeting the children, Dr. Steinberg stated that she believed that mother was intentionally alienating the children. Department investigator Jamie Hein spoke with Dr. Steinberg and concluded that it was

"apparent that [Dr. Steinberg] has had significant communication with father and has taken a side."

Dr. Steinberg told Hein, "I think it's false accusations against the father without a doubt," and that "[mother] had the police at [father's] house today," although it was unclear how Dr. Steinberg knew this. Dr Steinberg stated that mother was " 'one of the most vicious women I've met' " based on a statement mother purportedly made to paternal grandfather. When Hein disclosed that the children were consistent in their statements, Dr. Steinberg "[w]ithout hesitation . . . sounded as though she did not believe the children's statements." It therefore appeared to the Department that she was not a neutral therapist per the court's order.

## 6. Jurisdiction and Disposition Report

On October 1, 2020, the Department filed its jurisdiction and disposition report. The report contained new witness statements from the family obtained by Hein and Garza.

On August 4, 2020, Garza had met with the children for an initial visit. Garza engaged the children on the subject of the June 2020 incident. Al.G. told Garza that father tackled him because Al.G. " 'didn't want to go walking during the civil unrest' " and that he would commit suicide before seeing father again. O.G. confirmed Al.G.'s statement and reported that father " 'always gets very angry if [they] don't do what he wants.' "

An.G. stated that father had sexually abused him by " 'put[ting] his finger in [An.G.'s] butt.' " Garza questioned him about the abuse and An.G. stated it had occurred after they had gone boating and An.G. was tired and went to his room. He was lying on his stomach when father entered, pulled down his shorts, "pulled [his] cheeks and put his finger in me." An.G. confirmed

13

that he meant that his father had placed his finger in An.G.'s rectum. An.G. stated that it had occurred twice before but he could not recall details, other than it happened at least once in father's bedroom with stepmother in the room. Al.G. and O.G. told Garza that nothing similar had happened to them.

The children stated that father "[w]eighs each one of them when they come to his home for a visit" and makes them run a minimum of two miles if they have gained any weight; "verbally abuses them by calling them names such as 'pregnant bitch' and 'fat pussy' "; withholds food if he is unhappy with them; and forces them to sit for photographs and tells them to look happy so he can use them as proof.

Garza spoke with father and stepmother at their home on August 5, 2020. Father showed Garza a video of the June 4 incident that was captured by cameras outside his house. The report states that "[t]he video shows father. [*sic*] stopping [Al.G.] by placing his hands on [Al.G.'s] shoulders and pulling him back into the yard" and noted that it was "unclear whether [Al.G.] lost his footing due [to] the pressure of being pushed/pulled by father or simply miss-stepping." Father also showed a video taken on a cell phone with sound in which Al.G. was "very upset as evidenced by crying and yelling." In the video, Al.G. stated " 'Get off me' several times in a clearly upset/dysregulated manner" and stated " 'Stop recording me' in the same upset fashion."

Father stated that he believed mother to be "bi-polar or borderline" and that "[s]he's been trying to turn the boys against [him] for years." Father denied failing to properly feed the children and showed Garza receipts from food purchases. He showed Garza pictures of him and the children in which the

14

children were smiling. At the time the report was filed, Hein had been unable to interview father.

On September 26, 2020, Hein interviewed mother. Hein questioned mother about the fact that reports to the Department began soon after mother and father split up, and that it appeared that the children had been in the middle of father and mother's custody disputes for over a decade. Mother admitted that she had never seen father abuse the children in the manner described in the prior allegations but that the children had disclosed additional abuse that she could not report due to a family law judgment. Hein asked mother why she did not call father before taking Al.G. to the police station following the June 4 incident. Mother stated that when she reaches out to father, " 'it gets turned around on me.' "

Hein interviewed Barrera for the report as well. Barrera remembered the case because it was a " 'custody case.' " She recalled that father " 'was difficult" and told her that he was " 'going to record this whether you like it or not.' " Barrera described him as having a temper and " 'anger issues.' " She recalled that mother " 'did a lot of coaching' . . . [such as] ' "Tell the truth. Tell them how you don't like to be with him (their father) so you don't have to see him anymore. You have to tell them everything or you are going to have to still go see him." ' " Barrera concluded that there was no abuse or neglect. She believed " '[i]t was mom coaching them' " and observed that Al.G. seemed the most coached and aligned with mother.

Officer Jenkins explained the inconsistencies between Al.G.'s story and the video of the incident and stated that the " 'physical abuse was unfounded as far as criminally.' " However, he did not believe that mother was coaching the children. Officer

Jenkins thought the children were each " 'very afraid of their dad and they all have different issues with their dad.' "

Garcia told Hein that father was " 'hesitant' " to allow Al.G. to participate in individual counseling with her " 'because of past reports (to DCFS).' " Garcia completed an assessment at father's house. He requested a copy of the assessment and sent back edits. Garcia added the edits with a note that they came from father. He sent back additional edits which were not incorporated into her assessment. Garcia described father as " 'controlling.' " He attempted to obtain a statement from her that mother was manipulating the children. Father's attorney also repeatedly contacted her, " 'basically threatening [her] and wanting [her] notes from [her] assessments.' " Al.G. did not disclose any current abuse to Garcia. Garcia did not get the sense that mother was coaching or coercing the children.

The report included the summary of Hein's interview with Dr. Steinberg that was described in the last minute information. It also noted that Dr. Steinberg had asked Garza about his licensing status and had told him, " 'I could throw a lot of work your way. There's good money in these Parental Alienation cases.' "

The Department's report acknowledged that, "[d]espite repeated statement[s] from the children to numerous professionals, the Department had no physical evidence, such as bruises, video, collateral witness statements or police corroboration to support that the children are current victims of physical abuse. The allegations of ear pulling, hair pulling, hitting and throwing the children against the walls were all previously investigated and either unfounded or inconclusive." However, the Department still had "concerns about ongoing

16

physical intimidation and inappropriate discipline in father's home" and stated that its assessment was "that there is a recurring theme of inappropriate, insensitive, and unwarranted discipline by father, inappropriate boundaries by father, and inappropriate parenting techniques by father." Examples of this included "pulling a child's hair and ears . . . , withholding food, body shaming and using excessive exercise . . . , video-taping the boys at inappropriate times and against their wishes . . . and pulling the children's shirts up and blowing air on their stomachs . . . ." The Department further assessed that "the children overstated the allegations of abuse and neglect as children and adolescents will do given their age and level of immaturity," but that this "likely occurred in an effort for the children to ensure that their concerns are heard and believed or as a way to bolster their wish not to visit their father."

The Department believed that "the parent's [*sic*] on-going custodial conflict is at the root of the issues in this family," as both parents are "litigious," "which results in the children being placed in the middle of their conflict once again." The Department recommended that the children be detained from father and released to mother and that the court order family reunification services for father and family maintenance services for mother.

The report attached the summary of a forensic evaluation of the children performed in August 2020 at the Harbor UCLA Hub. Mother waived her right to be present during the interviews. The evaluator noted that "[a]ll three children reported extensive sexual, physical and emotional abuse by their father." It further noted that "[t]he children's mental distress resulting from the abuse was excessive, as evidenced by the

17

children's constant fears of punishment, violence, and retaliation by [father], their anxiety about visiting [father] or being in his care/custody, their insomnia/altered sleep habits, they [*sic*] high levels of attachment to [mother], and [Al.G.]'s suicidal ideations/plans if he is to return to [father's] home/custody."

**7.    First Amended Petition**

The first amended petition, also filed October 1, 2020, amended the counts alleged under section 300, subdivision (c). Count c-1, as amended, alleged that the children were victims of emotional abuse because of an ongoing custody dispute between mother and father, "which includes the parents making continued accusations of abuse and neglect against each other" since 2011, which placed the children at risk of suffering serious emotional damage. Amended count c-2 alleged that father emotionally abused the children by rationing and withholding food, punishing the children with exercise, weighing them repeatedly and frequently, body-shaming them, making audio recordings against their will and without their consent to humiliate and manipulate them, calling them derogatory names like "fat, pussy, wussy, and pregnant bitch," and punishing the children if they acknowledged their mother in public during his custodial time.

**8.    Trial**

Trial proceedings took place over approximately a year. Father, mother, stepmother, and the children each testified. The court also heard testimony from employees of the Department, including Figueroa, Garza, and Hein; police officers; a friend and current and former employees of father; mother's friend and

18

fiancé; and Linda Gottlieb, father's expert on parental alienation.[3]

### 8.1.  Al.G.'s Testimony

Al.G. was 12 years old at the time of trial. He testified that father often punished him by taking away meals. For example, father would not give Al.G. dinner after he greeted his mother at a sports game when father had instructed him not to, or if father did not like the way he said something or something he did. Father hit Al.G. multiple times, kicked him, pushed him, yelled at him, and pulled his hair and ears in a way that hurt, including multiple times within the last year that Al.G. had in-person visits with father. Father usually appeared angry when he did so. Father punished Al.G. by making him run on the treadmill. Al.G. felt that he had to run the most "because [father] didn't like [him]."

Father weighed the children every day they were in his house and recorded their weight in a chart. The children would lose a point for gaining weight and gain a point for losing weight. This made Al.G. feel very negative about his body. Father made derogatory comments about Al.G.'s weight, including " 'pregnant bitch,' 'fat,' 'you need to lose this,' (indicating) 'you need to lose that' (indicating)," while grabbing Al.G.'s stomach. These comments made Al.G. feel "very sad" and did not make him want to lose weight or change his habits.

_____

[3] Given the considerable size of the trial record, and in light of the deferential standard of review, which we discuss below, we primarily summarize testimony the court found to be credible. We also summarize the testimony of father's expert to provide context for arguments raised on appeal.

19

Al.G. testified that father is "one way in front of people and then he's a different way in front of us." Father spoke negatively about mother more times than Al.G. could count and said things like " 'Your mom's fat[,]' " " 'Your mom's poor[,]' " and " 'Your mom should work at Panda Express.' " Al.G. stated that father and stepmother would sit the children down for two- or three-hour conversations in which they accused mother of brainwashing the children. Father also showed him documents related to court proceedings, including Our Family Wizard messages and emails.

Mother did not brainwash Al.G. and told him to tell the truth. She did not say anything negative about father and did not allow discussions about the family law case in her home. If Al.G. stated that he hated his father, mother would say things like " 'That's not very good[,]' " " 'He's your dad[,]' " and " 'You should still see him.' " Mother tried to make him go to visits with his father when he and his brothers refused to go, and continued to encourage him even when he said he did not want to go. Al.G. did not wish to attend visits with father, even with another adult present, because he was afraid father would "say something or do something that would trigger something inside of me."

With respect to the incident on June 4, 2020, Al.G. testified that on a prior walk with his father, he had received a pass that allowed him to either skip a walk or "smack [father's] butt." On the day in question, there were riots in Santa Monica and it was the beginning of the Covid-19 pandemic. When father told the children that they would all go on a walk, Al.G. asked to use his pass to skip the walk because he felt that it would be dangerous to go. Father told him he would lose dinner if he did not go. Al.G. then asked to smack father's butt, though he did not mean it seriously. As Al.G. approached the gate, father threw Al.G. to the

ground. Al.G. testified that he was sobbing on the ground when father began cursing at him, calling him "pussy, wussy, jackass, bitch, motherfucker." He put his arms up to shield himself and father grabbed his stomach or hands. Father then took out his phone and started recording Al.G. Al.G. felt scared and tried to get away from father. Al.G. testified that father frequently recorded him and did not stop when Al.G. asked him to. On the rare occasion father explained why he was recording Al.G., father stated that it was for court.

Al.G. felt that father did preparation and belly meat to him more frequently than to his brothers. He described preparation as father pinning them down and belly meat as father rubbing his hands over their abdomens and "a combination of blows and tugs but like aggressively." This would take place "basically every single time" they were at father's house. Al.G. stated that father knew they did not like it. When performing belly meat, father pulled Al.G.'s pants down, exposing his penis, over 100 times. Al.G. also testified that father touched his penis during belly meat and that father put his mouth on his penis, and that this also happened around 100 times.

Father also performed cherry picking on the children after they told him "no." Al.G. demonstrated it to the court, which described it for the record: "The witness has his left hand underneath his groin and his other hand is touching that hand from the other side of his body, going against underneath his groin to touch the first hand described." Father had done this 10 to 40 times in the prior two years. Al.G. found cherry picking "very uncomfortable" and painful.

Al.G. testified that he witnessed father put a finger in An.G.'s anus on one occasion. He did not recall when it happened

21

or how old An.G. was. Al.G. testified that it took place in father's room but did not remember whether stepmother was present. The three children went into father's room, with An.G. entering first. Al.G. testified that father told An.G. "Come here." Al.G. did not recall how An.G. ended up on the bed. He was "pretty sure" he could see An.G.'s bare bottom and "pretty sure" that father had pulled his pants down. He did not remember whether he saw father put a finger or hand in An.G.'s anus. After a minute or less, Al.G. left the room. He did not remember speaking to An.G. about it afterwards.

The events to which he testified made Al.G. suicidal and caused him depression and anxiety. He stated that he would want to kill himself if he had to go back to father's house. Al.G. stated that he was in therapy and on medication for his anxiety and nightmares. He had dreams of father trying to kill him and mother. Al.G. feared that father would seek revenge because Al.G. had spoken up and that he would make Al.G.'s life an "even worse living hell."

Al.G. was emotional when giving testimony. Before his third day of testimony, the court stated for the record that court Department staff were so concerned about Al.G. when he testified that "they called out to the field to inform their supervisors and to make sure that supervisors checked on his mental and emotional well-being." On another occasion, the court explained for the record that, when asked to describe belly meat using his own body, Al.G. began to cry hysterically and ran out of the building. On a later date, Al.G. was in distress and suffering from chest pain while testifying. It was believed that he suffered an anxiety attack and he was taken to the hospital in an ambulance.

### 8.2. An.G.'s Testimony

An.G. was 12 years old at the time of trial. He testified that father was strict and controlling and would become upset and angry when he did not get his way. Father kept a chart in his house that started out as a way for the children to earn points to play a sport, but then became a weight chart. The children would earn or lose points based on their weight and would have to weigh themselves between two and five times every visit. If the children refused to weigh themselves, father would deny them their next meal. An.G. testified that he was denied meals between 35 and 50 times at father's house. Father also disciplined the children by pulling their hair and ears and punching them. Father slammed O.G. into the wall on one occasion when O.G. failed to greet father quickly enough. Father also kicked An.G. as punishment for breaking a rod in his closet.

An.G. did not feel free to be himself at father's house. He felt that he had no privacy and that father used the cameras in the house to spy on him and his brothers. Father "would have proof of everything [the children] said or [did]." An.G. testified that there were situations where the children would all be on camera and father would ask them "set-up questions," including whether anyone had ever hurt them, touched them in private places, or denied them a meal. Father did not tell them what to say but would be angry if they did not respond in a certain manner and would accuse mother of brainwashing them. When An.G. was around 10 years old, father and stepmother sat the boys down for a two- to three-hour conversation about their mother brainwashing them. They had the same conversation about brainwashing several times. An.G. did not feel it was the truth, as mother did not speak to them about father and

23

encouraged them to visit father. However, father spoke about mother and told the children she was "poor, ugly, fat and that she should work in a fast food restaurant." An.G. also testified that father had a large binder in his office labeled "[mother's] lies."

With respect to the June 4 incident, An.G. testified that the family was going on a walk to see the National Guard because father wanted the children to thank the National Guard. An.G. did not want to go because of the Covid-19 pandemic, but father told the children that they would not get dinner if they did not. Al.G. was upset because father would not let him use his pass to skip the walk. An.G. testified that father threw Al.G. to the ground and began cursing at him. An.G. did not know why his father responded in that way but was afraid of talking back to father because father would become upset.

An.G. testified that father would do preparation to him at least once a visit, and usually two to four times during the typical four-day visit. Father would usually do belly meat two to four times during the typical visit as well. An.G. told his father that he did not enjoy preparation or belly meat, but father would hold him down. He described preparation as father rubbing his nipple and abdominal area and belly meat as father blowing and sucking on the same area. Father did not put his hands or mouth on An.G.'s penis during preparation or belly meat. Father also performed "cherry picking" on An.G., during which father held An.G. by the groin and picked him up. Father knew that he did not like it, but that father would do it an average of two times during the typical visit.

An.G. also testified that father had put his finger in his anus on multiple occasions. The first incident occurred around the time An.G. was eight years old and took place in father's

bedroom. It happened during a period when the children had to go to father's room to greet him good morning or they would not receive breakfast. Father told him to come to the bed and instructed him to lay face down on the mattress. He removed An.G.'s shorts and then stuck his finger in An.G.'s anus. His brothers were also in the room and stepmother was getting out of bed. An.G. asked father to stop around five times but he did not. The incident lasted seven to 15 seconds. An.G. later told his brothers and mother. The second incident occurred at least a year later, when An.G. was 10 years old. It was the afternoon and An.G. was reading in his room when father entered, sat on top of An.G.'s legs, pulled down his shorts, and put his fingers in An.G.'s anus. He told his mother and brothers between a few days and a month later. The third incident took place several months later, at night, when An.G. and O.G. were in their room, lying in bed. An.G. believed O.G. was still awake. Father entered the room and came over to An.G.'s bed and removed his own boxers. He sat on top of An.G., held his head down, and again put his finger in his anus. An.G. told him to stop but he did not. O.G. also did not respond. Father then told An.G. "if [he] told anyone, [he wouldn't] want to know what would happen." When An.G. told mother, he asked her not to tell anyone but thought that she might have called someone about it.

An.G. testified that he did not feel comfortable around father because he did not want father to get mad at him and his brothers and punish or hurt them. An.G. did not want to see father again. He did not believe father would ever be truly sorry for anything that had happened.

### 8.3.  O.G.'s Testimony

O.G. was also 12 years old at the time he testified. O.G. did not enjoy himself at father's house and did not ever have a good relationship with father. He was afraid of father and felt that father's actions were hard to predict. O.G. recounted a time that he did not greet father fast enough and father held him up against the wall and pulled his hair. Father had held him against the wall in a similar manner on approximately five occasions. When O.G. was younger, father used to pull his ear frequently and it was painful. O.G. did not feel comfortable speaking openly around father or telling father if he did not like something father did because when Al.G. did so, he would always get punished.

O.G. was scared and afraid when father threw Al.G. to the ground during the incident in June 2020. On the evening after the incident, O.G. used a Google Doc to explain to his mother what had happened. He stated that he wanted to die because of father. The document described the incident and how father had called Al.G. a " 'fucking wussy, pussy.' " Al.G. also wrote in the document: " 'Tomorrow if things were as bad as today, I might runaway [*sic*].' " O.G. testified that the June 4 incident was not the first time that father lost his temper and became physical with one of the children.

O.G. testified that the weight chart was used when he was nine or 10 years old. During that time, father weighed the children every morning. They would be awarded a point for losing weight and lose a point for gaining weight. This process upset O.G. Father also used exercise as a punishment during the two years preceding the case. When the children did something father did not like, such as talking back, he would tell them to run a mile or two on the treadmill. Father would not let them eat until

26

they ran. O.G. believed he had lost at least 30 to 35 meals in the prior two years as punishment and believed his brothers had lost as many meals as he had.

Father said negative things about mother to the children, such as that she brainwashed the children and that she was fat. O.G. felt that father was the one who tried to brainwash him because father always talked badly about mother, whereas mother did not speak about father and told the children that they had to visit father.

O.G. described preparation as father rubbing all over the children's stomachs and sometimes their nipples. O.G. did not recall a time when father's hands ever went lower than his stomach and never observed father's hands go any lower when he was doing preparation to the other children. O.G. described belly meat as father "lick[ing] and slobber[ing] and, like blow[ing] on [their] stomachs." Father performed belly meat mostly on O.G.'s stomach and his mouth did not go anywhere lower. O.G. did not enjoy preparation or belly meat and would scream for father to stop. He described cherry picking as when father "would grab [their] hands and penises and like hold [them] from behind." O.G. testified that it did not feel good and he did not like it but was not sure whether father knew that.

O.G. testified that he was present for two of the incidents during which father put his finger in An.G.'s anus. He testified that the first took place when he and An.G. were eight or nine years old. Father told An.G. to come to his side of the bed. Father pulled An.G. under the blankets so O.G. could not see all that happened. O.G. stated at first that An.G. was facing the wall but then testified that An.G. was on his stomach and that he could not see An.G.'s face. O.G. stayed for a few seconds before leaving

27

the room. He did not know what happened until An.G. told him later that day. The second incident took place in his and An.G.'s room at night. O.G. had his eyes closed when father entered. He heard An.G. yell " 'Stop' " but did not hear any other noise. An.G. later told him that "it happened again."

O.G. testified that he had nightmares because of father's treatment of him. He feared that father would hurt him and his brothers both mentally and physically. He did not think there was any relationship with father to repair. O.G. believed that, if they had a monitored visit with father, he would "just be faking it." O.G. did not believe father loved him or his brothers, even though father told them that he did.

### 8.4.   Department Testimony

Social worker Figueroa testified that she interviewed each child privately and found them to be credible. She had no concerns about the children being coached. Nothing in her interview with mother gave Figueroa reason to believe mother was coaching the children. Figueroa also did not get the impression that mother was using the children as a weapon against father. She described father as "very demanding" and felt that he had tried to pressure her. She found mother to be open and honest and did not feel that mother was demanding. On cross-examination, Figueroa acknowledged that she received no training from the Department on parental alienation and that she was not an expert in investigating parental alienation. She further stated that it was her job to believe children.

Sandra Hernandez, the social worker currently assigned to the family's case, also testified.[4] At the time she testified, Hernandez had worked with the Department for 21 years and had been assigned to the family's case for seven or eight months. She had no concerns that the children were saying what mother wanted them to, although she "always" considered that possibility. Hernandez spoke with father's expert, Linda Gottlieb, who had reached the conclusion that they were being alienated, but told Hernandez she had not met the children. Hernandez testified that, as a social worker, she would not be able to make an assessment without contacting all parties involved. Based on Hernandez's interactions with mother, and even after speaking with father and Gottlieb, Hernandez did not have any basis to believe that mother was attempting to interfere with father's parenting. She believed that the children had genuine reasons why they did not want to interact with father.

Hein also testified. She had been a social worker since 1993 and had been a dependency investigator for 22 of the 24 years she worked at the Department. Hein stated that "it was a concern" that mother might be coaching the children, both because it was a "sort of a custody situation" and because there were mentions in the Department records of such concerns. However, Hein did not feel that mother was coaching the children based on their interactions and found mother credible. Hein testified that father appeared open and forthcoming in his interview, although she

---

[4] Hernandez was assigned based on the supervising social worker's "understanding that Mr. Garza and [father] could no longer communicate effectively, and it was causing . . . the situation to be more stressful on everyone."

felt pressure "by him and his attorney, at times." Hein also felt that father was not credible "on certain things," in part because "the children would say one thing, and he'd have an explanation or deflect from that in some way[,] shape or form."

Hein felt that "the emotional abuse is the main aspect of this case." With respect to the physical abuse allegations, Hein concluded that "there was more concern of inappropriate discipline as opposed to physical abuse." Although there was no physical evidence of sexual abuse, Hein stated that this was often the case.

Hein believed the custody battle between the parents had a negative effect on the children and that both parents played a part in it, though she could not say whether they played an equal part. Hein testified that, "when watching [the children] and reading what they said, it's almost like they've told the story so many times they're repeating it in their head, and they're hypersensitive trying to get their voice heard." She did not attribute this to any undue influence from an adult and did not think the children were lying about what they disclosed. She thought "they are genuinely emotionally upset and in despair."

Garza testified that he had taken steps to try and determine whether mother was actively alienating the children, including by "ask[ing] the children repeatedly, generally every visit when interviewing them alone and together . . . has their mother made any denigrating remarks about their father" or "told them to . . . make untrue statements." The children always responded in the negative and Garza found them to be credible. Nothing in their demeanor caused him to be concerned that mother was alienating them from father. Garza testified that father's actions in the case seemed "very, very much over-the-

top." This included father's submission of "a huge amount of documents," including materials on parental alienation, which Garza did not believe to be " 'real evidence' " but "designed to sway the person who is reading them."

### 8.5. Therapist Testimony

Garcia testified that she provided individual therapy to Al.G. She spoke with both parents to go over intake and assessment forms, which concerned the child's relationship with the parents and school and medical history. Father asked Garcia to tell him what mother had said on her forms, which Garcia declined to do. Garcia testified that she initially felt uncomfortable during a meeting with father at his home because he had set up a camera to record them. Garcia further testified that a telephone call between her and father that was played at trial was recorded without her knowledge or consent.

Garcia testified that father tried to instruct her on what she and Al.G. could talk about and told her not to discuss the court case with him. Al.G. then participated in a session from father's house, during which he and Garcia discussed the case. Father later asked Garcia again about what mother had said and, when Garcia refused to tell him, his tone became "aggressive" and he told Garcia, "I specifically asked you not to talk to [Al.G.] about the court cases, and you did during the last session." This demonstrated to Garcia that father was watching the sessions that took place at his house. She believed that father was controlling. Garcia did not find mother controlling. Mother did not ask what father said on his intake forms or tell Garcia what she could discuss with Al.G.

When at father's house, Al.G. "seemed very uncomfortable," "very unresponsive," and gave "small answers." At school, Al.G.

31

had been "very hyper, very friendly, very willing to talk." When at mother's house, he also "act[ed] as though he was the same child when [they] were in person at school . . . very willing to speak to [Garcia] about anything . . . ." In her sessions with Al.G., Garcia did not see anything trained or rehearsed from him.

### 8.6. Expert Testimony

Gottlieb, father's expert on parental alienation, testified that she concluded that mother had engaged in a "determined" and "malicious" effort to sever the relationship between father and the boys based on her consideration of the "total clinical picture." Gottlieb testified that she reviewed the video of the June 4, 2020 incident, Our Family Wizard messages provided by father, custody evaluations performed by Dr. Suzanne Dupee in 2014 and another doctor in 2011, deposition testimony from mother, "motions and rulings," Department reports, testimony from officers, pediatrician records, and school records; interviewed two pediatricians and father; and listened to audio recordings of the children. Gottlieb opined that the allegations against father lacked "credible, neutral, collateral corroboration," such as "medical records, police reports, school records, information from the nannies who were always in the house when the kids were there with [father], the records from the school," and other "evidence from parties . . . that has [*sic*] no interest in the outcome of the case." She believed that mother was the abusive parent and was projecting abuse onto father and "programming the boys against their father to falsely believe that he has sexually abused them." She stated that father was not a markedly deficient parent such that the children's rejection of him would be justified, but acknowledged that "he can be a bit controlling and a bit want his point of view given a lot of

32

consideration." She opined, based on research, that it was "anti instinctual" for children to reject even an abusive parent, and that she had "never experienced a child rejecting a parent unless the child was alienated."

Based on her review of records, Gottlieb believed the children were "engaged in delusion thinking" and had broken with reality based on their belief in the allegations of sexual and physical abuse. Without court intervention, the children were at increased risk of developing personality disorders. She believed that they were already exhibiting antisocial behaviors, such as "lying, making up stories, deceiving" and maltreating a parent. Gottlieb testified that an example of Al.G.'s antisocial behavior was present in the declaration of one of the children's nannies. When informed that the nanny testified that she did not write that declaration but had merely signed it, Gottlieb stated that this only changed the weight given to that declaration, not her overall opinion.

Gottlieb testified that she was able to make a finding "with 99 percent clinical certainty" that the children's allegations of abuse were meritless because a research study had concluded that, in high conflict custody cases, the prevalence of actual sex abuse was only two percent. Gottlieb testified that the only evidence she would trust to establish sexual abuse in a high conflict custody case was a video of the sex abuse taking place. Gottlieb also concluded with "99 percent clinical certainty" that mother was intentionally alienating the boys from father.

On cross-examination, Gottlieb agreed that the court would have to conclude that no abuse and no pattern of markedly deficient parenting took place in order to conclude that parental alienation had taken place. She testified that speaking with the

children was "not required by the standard of clinical practice or the standard to give an expert opinion" and "[a]bsolutely [would] not" be informative. She "certainly wouldn't accept the word of an alienated child that something actually happened." Similarly, Gottlieb stated that interviewing mother "definitely [would] not" be informative. Gottlieb denied that any updated psychological assessments would be necessary to her opinion and testified that they were "[v]ery often misleading and misused" and that they are widely used only "[b]ecause most forensic evaluators have not been trained in the family dynamics, and they don't know what to look for." She testified that 90 percent of her profession gets the issue of alienation wrong.

Gottlieb opined both that "when children are abused, 'it's like pulling teeth to get them to give up their parents'" and that the fact that the children had not disclosed the abuse at an earlier point in time was evidence of alienation. Gottlieb agreed that she was not present at any of the children's prior interviews and did not know whether they were resistant to speaking about the abuse. Even if they had been, it would not change her overall opinion. Gottlieb further testified that she would need more information to determine whether father putting his mouth on the children's stomachs despite their protestations or forcing the children to eat hot peppers as a punishment were indicative of estrangement caused by father's actions, rather than parental alienation alone. She agreed that her conclusion to 99 percent certainty that the children were alienated was based on the information made available to her and that "[t]here are a lot of things that could have changed my opinion if I heard the whole clinical picturing."

Gottlieb testified that she was paid $50,000 for her evaluation and $2,000 per day for her testimony.

### 8.7.  The Court's Ruling

The court began its ruling by observing that "[t]he multiple family law bench officers who have handled the G[.] family law case have a great disadvantage of not hearing from these three very articulate, intelligent, credible, and sincere boys. . . . [¶] The comfort level all three of the boys had in testifying in this case was visibly evident and allowed them to be forthcoming, honest and candid about many painful truths." It found that the children did not appear coached and did not offer canned responses. The children "stated they were more comfortable telling the truth of what happened in court after speaking with Dr. Poulter [their therapist]." The court believed that, "[u]nlike in previous interviews, the boys were under oath in court, and they took that oath seriously, they felt comfortable . . . . They testified to feeling free to tell the truth in court and they felt listened to in court."

The court found that Hein "generated a very balanced report" and that her testimony was "very credible and balanced." The court similarly found that Garcia "was a very neutral and credible witness," as were Garza and Figueroa. The court found that Gottlieb's testimony was "biased, one-sided and completely uninformed regarding the facts of this case" and that she had relied on "very limited, stilted and outdated information to reach her conclusion that parental alienation exists in this case."

The court amended the petition by interlineation and sustained the petition as amended. It struck the counts under section 300, subdivision (a). It amended counts b-1 and b-2 to allege inappropriate physical discipline based on the June 4, 2020, incident and father hitting and punching the children,

pulling their hair and ear, and throwing them against the wall. It struck counts b-1 through b-6 and count b-8 and amended count b-7 to allege that father had, "[o]n prior occasions . . . sexually abused the child [An.G.] by inserting his finger into the child [An.G.'s] anus." The court struck count c-1 and amended count c-2 to allege that father "emotionally abused the children by rationing their food portions and withholding food from the children, punishing the children with excessive exercise, repeatedly and frequently weighing the children, body-shaming the children and documenting their weight on a chart," making "audio and video recordings of the children against their will and without their consent as a way to humiliate, intimidate and manipulate the children," belittling and humiliating them "by calling them derogatory names such as fat, pussy, wussy, and pregnant bitch," "us[ing] verbal and physical intimidation and threats to control and manipulate the children," "engag[ing] in unwanted and inappropriate physical contact with the children in the form of 'belly meat,' 'preparation' and 'cherry picking' which was done against the children's wishes," and "punish[ing] the children if they show their mother attention in public during father's custodial time." The court struck counts d-1 and d-3 and amended count d-2 to allege that father had, "[o]n prior occasions . . . sexually abused the child [An.G.] by inserting his finger into the child [An.G.'s] anus." The court struck counts j-3 and j-5 and amended counts j-1, j-2, and j-4 to reflect the amendments made to the allegations under subdivisions (b) and (d).

## 8.8. Writ Proceedings

During the pendency of the trial, father filed five petitions for writ of mandate with this court. The first writ petition

36

concerned the court's denial of the *pro hac vice* application of one of father's attorneys. After a panel of this court issued a notice that it intended to grant the peremptory writ on the ground that the court had abused its discretion in denying the application, the juvenile court granted the application and the petition was dismissed as moot. The second writ petition addressed the court's exclusion of father's family law exhibits and many of his witnesses. A panel of this court denied the petition but noted that nothing in its order should be construed as a reflection of the court's opinion concerning the admissibility of impeachment evidence. The third writ petition challenged an order of the juvenile court discontinuing visits between father and the children during the children's testimony without holding a noticed hearing. The petition was denied "without prejudice to the filing of a new petition if the respondent juvenile court does not conduct a properly noticed hearing, within three weeks of the date of this order, to consider the propriety of suspending [father's] visitation with the children and the children's participation in conjoint therapy." A fourth writ petition concerned the court's refusal to continue the hearing on visitation after father suffered complications from a surgery because it understood this court's order to require that the hearing be completed within three weeks. A panel of this court denied the petition but clarified that nothing in its prior order required the juvenile court to conclude the proceedings within a set period of time. The final writ petition followed the juvenile court's order striking father's statement of disqualification, which sought the court's disqualification on the ground that it lacked impartiality. This petition was summarily denied.

## 9. Disposition Report and Hearing

In a disposition report filed in March 2022, the Department stated that Hernandez continued to meet with the children on a monthly basis. At a meeting that took place in February 2022, O.G. and An.G. informed Hernandez that they continued not to want visits or contact with father. O.G. felt they would be "meaningless" and that his life was "much better now that his father is not in his life." An.G. stated he did not want to receive any cards or letters from father because "father was not going to be honest." He was doing better in school because he was able to sleep better at night not seeing father.

Al.G. also told Hernandez that he did not want any contact with father. He believed that father was in a car following him the day before, and it was not the first time he felt a car following or a person taking pictures of him. Al.G. expressed fears of being kidnapped for ransom, or "that father would kidnap him to keep him quiet since he had already said too much against father." He did not feel safe having contact with father. He asked Hernandez to give the court a statement from him: " 'If I ever see that man I don't care how old I am or he is or if he even tried to come in contact with me I will attack him and kill him so I strongly suggest you stay away from me because you know what you did.' " Al.G. was angry with the Department for allowing father to abuse him and for failing to do anything in its prior investigations.

The Department recommended that the court sustain the petition and terminate jurisdiction with a family law order granting mother sole physical and legal custody of the children. It also recommended that the family law order provide for monitored visitation for father, provided that he participates in

individual counseling and complete a parenting class, an anger management program, and a "Parents Beyond Conflict" or similar program.

Hein and Hernandez testified at the disposition hearing held in March 2022. Both stated that they did not believe it would be appropriate for the children to begin reunification therapy with father, or begin to see father, until a therapist recommended it.

The court found by clear and convincing evidence that remaining in father's home would pose a substantial danger to the children's physical health, safety, and emotional well-being and that no reasonable means existed to prevent removal. It further found that father refused to take any responsibility for the physical and emotional abuse he inflicted on the children. The court terminated jurisdiction and awarded mother sole legal and physical custody. It further ordered that, in order to begin visitation with the children for one hour a month in a therapeutic setting, father would need to complete individual counseling, receive counseling on parenting for high conflict individuals, complete an age-appropriate parenting course, complete anger management, and complete a sex abuse awareness for perpetrators course.

## DISCUSSION

Father contends that the juvenile court's jurisdictional findings must be reversed for lack of substantial credible evidence. He asserts that the court abused its discretion in limiting the witnesses he could call at trial, particularly those he describes as "impartial, independent professionals with an intimate and percipient knowledge of the entire family dynamic." (Italics omitted.) He argues that the escalating allegations of

39

abuse over time, the contradictions in the children's testimony, and the testimony of his expert fully demonstrate that the children were alienated by mother and that their testimony was entitled to no weight. Father further contends that the juvenile court demonstrated bias through various adverse rulings and the manner in which it questioned witnesses and addressed his counsel. Finally, father contends that this proceeding was a "family law war . . . waged by other means" and that the dependency court was not an appropriate venue to resolve the issues raised in the petition.

## 1. The court did not abuse its discretion in excluding witnesses and documentary evidence.

### 1.1. Applicable Law

"We review the evidentiary rulings of the juvenile court for abuse of discretion, and will not disturb those rulings in the absence of a showing of a manifest abuse of that discretion." (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1249; accord *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176 ["[We] will not disturb a trial court's broad discretion in determining admissibility of evidence unless its ruling is shown to be ' " ' "arbitrary, capricious, or patently absurd. . . ." ' " ' [Citation.]"].)

"In dependency proceedings, as in other civil proceedings, parties have a due process right to cross-examine and confront witnesses. [Citations.]" (*In re Dolly D.* (1995) 41 Cal.App.4th 440, 444.) "But due process also is a flexible concept, whose application depends on the circumstances and the balancing of various factors." (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 757.) "The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence

40

[citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court." (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146–1147.) " '[D]ue process does not require the admissibility of *all* evidence which may tend to exonerate the defendant.' [Citation.]" (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 133.)

### 1.2. Analysis

Father contends that the court "abusively limited" father from presenting both his case in chief and rebuttal case. We disagree.

Father's witness list contained over 60 witnesses, whose testimony was estimated at over 115 hours: nine expert witnesses (whose testimony was estimated at 22 hours), two party witnesses (himself and mother, whose testimony was estimated at 24 hours), and 50 collateral witnesses (whose testimony was estimated at nearly 70 hours). These estimates did not include rebuttal witnesses. Many of the collaterals were current or former employees of father, "family friend[s]," current and former coworkers of father's, and relatives of father's. Some, such as former neighbors of mother, appeared to be offered for the sole purpose of discrediting mother. The court concluded that father's list was "excessive, duplicative, redundant, and largely irrelevant."

Father asserts that the court "allowed the Department, minors' counsel, and Mother's counsel to litigate for weeks and weeks of court time," while unfairly limiting his witnesses. However, the exhibit lists of the Department, children, and mother largely overlapped with one another *and* with father's

41

list. Moreover, we cannot fault the court for concluding that the testimony of the children—who were absent from father's witness list—was of substantially greater relevance to the allegations of the petition than the testimony of father's coworkers, the children's teachers, former neighbors of mother's, and other people who likely had limited or no familiarity with father's interactions with the children in the home.[5]

Sixteen people on father's witness list testified at trial.[6] This included an expert witness on the issue of parental alienation, as well as two former nannies employed by him, a boat captain he hired, and a friend, who each generally testified that father was a loving father and behaved appropriately with the children and that the children loved him in return, and thus impeached the children and mother's testimony. One of the nannies also testified that she heard mother speak badly of father in the children's presence. Father's request to put approximately 40 additional witnesses on the stand whose testimony would likely have taken 18 additional trial days, if not more, was inconsistent with "[t]he state's strong interest in prompt and efficient trials" and would " 'necessitate undue consumption of time.' [Citation.]" (*Maricela C. v. Superior Court*,

---

[5] Although the children testified for weeks, the trial generally took place for only three hours each trial day, and trial often did not take place every day. Furthermore, the length of the children's testimony owed in part to father's comprehensive cross-examinations. For example, of the 16 days Al.G. was on the stand, seven days consisted of cross-examination by father.

[6] We do not include the children's therapist, Dr. Poulter, in this total, as he was called for the limited purpose of testifying about the detriment to the children of visiting father during their testimony.

*supra*, 66 Cal.App.4th at pp. 1146–1147.) We have reviewed the offer of proof and are unconvinced that father demonstrated that each of the dozens of witnesses would have provided non-cumulative and "relevant evidence of significant probative value to the issue before the court." (*Id.* at p. 1147.) For example, in the offer of proof, father represented that the two nannies the court allowed to testify would speak to mother's false statements and abusive behavior, the children's positive relationship with father, and father's appropriate behavior with the children. Over twenty of the other collateral witnesses would have testified to the same or very similar issues.

Father further contends that the court abused its discretion in denying his request to allow Dr. Dupee and Judge Aviva Bobb—whom he describes as "two of the most significant, independent witnesses"—to testify as rebuttal witnesses. In his offers of proof, Father asserted that Dr. Dupee would testify concerning her 2014 evaluation of the family, which he contends supports his theory of parental alienation, and that her testimony would impeach testimony from the children, mother and social workers about whether the children were abused. Although the court did not allow father to call Dr. Dupee, it accepted her report into evidence.[7] Father was able to cross-examine mother at length about statements Dr. Dupee made regarding mother's behavior in the evaluation. Moreover, Gottlieb relied on Dr. Dupee's conclusions extensively in her report and cited Dr.

---

[7] Father's contention that Dr. Dupee's report was excluded is not supported by his record citations. In fact, on October 26, 2021, his counsel expressly noted that Dr. Dupee's report—marked as exhibit 385—had been admitted into evidence.

43

Dupee's evaluation in her trial testimony multiple times as support for her conclusions. The court did not abuse its discretion or violate father's due process rights by concluding that testimony from a doctor whose last interaction with the family took place when the children were between five and seven years old was not of significant relevance to the allegations of the petition, or to rebutting testimony concerning abuse that allegedly took place after 2014, and would not justify the additional consumption of court time.

Judge Bobb was a private judicial officer who presided over dissolution proceedings between father and mother. Father did not represent in his offers of proof that Judge Bobb had ever interacted with the children, nor did he describe when Judge Bobb's involvement with the family ended. Mother's testimony indicates that Judge Bobb stepped down after mother filed a motion to disqualify in or around 2016, years before much of the conduct described in the petition and in the children's testimony took place.[8] The court did not abuse its discretion in concluding Judge Bobb's testimony was of limited relevance to the allegations of the petition. The court could have also reasonably

---

[8] The court instructed mother's counsel that mother's testimony concerning Judge Bobb should pertain to the allegations in the petition that mother failed to protect the children and should not address other family law issues. Mother testified that when she raised concerns about father's conduct to Judge Bobb, she received reduced custody. Even if Judge Bobb would have refuted mother's claim that she was prevented from reporting abuse, such testimony would not go to the substance of the children's allegations against father, but the issue of mother's credibility, which father already called into question through the testimony of his witnesses and through his cross-examination of mother.

concluded that testimony from a family law officer might turn the dependency trial into another forum to relitigate family court disputes, which would be an inappropriate use of court resources. (See *In re Nicholas E.* (2015) 236 Cal.App.4th 458, 466 [" 'The juvenile courts must not become a battleground by which family law war is waged by other means.' "].)

In other portions of the argument section of his brief, father contends that claims by the children of abuse "would have been fully impeached if the trial court had allowed the impeachment evidence proffered by Father in the way of: . . . Dr. Lynn Steinberg, and Terri Barach, LMFT, and numerous percipient nannies." For purposes of argument, we will assume these contentions are not forfeited because they were not raised under the heading concerning the exclusion of evidence. We again conclude that the court did not abuse its discretion in excluding these rebuttal witnesses. Although the court did not allow father to call all former nannies to the children as witnesses, he was permitted to call two. Due process did not entitle father to put every nanny who ever interacted with the children on the stand to rebut the children's testimony. (See *In re Jordan R., supra,* 205 Cal.App.4th at p. 133.)

Dr. Steinberg never met the children. The Department expressed concerns that Dr. Steinberg had aligned with father based on information he provided to her. Counsel for the children stated that a brief conversation with Dr. Steinberg left her under the impression that Dr. Steinberg was "predisposed to determining that [the children] are liars, that they have been pushed by the mother, and that this is a clear case of parental alienation." Before trial started, the court concluded that the bias Dr. Steinberg had displayed was "quite shocking and

45

unconscionable and inappropriate." It was not an abuse of discretion to conclude that rebuttal testimony from Dr. Steinberg would be of limited relevance, might be neither impartial nor credible, and would necessitate undue consumption of court time.[9]

Father has also failed to demonstrate that the court abused its discretion in concluding that Barach's testimony would be cumulative or that its probative value was substantially outweighed by the probability that its admission would necessitate undue consumption of time. Barach was a therapist agreed upon by the parties to facilitate visits between the children and father. Al.G. testified that he felt that Barach was not responsive to his concerns and dismissed his feelings about father. According to his testimony, the children had met with Barach "four or five times." Father wished to call Barach to rebut this testimony and to testify to a request she made to the court that the children be evaluated by an expert on parental alienation. However, every one of father's witnesses called the children's credibility into question. Further, father did not represent that Barach was an expert on parental alienation or that she would opine that the children were indeed alienated, merely that she believed an assessment of the children by such an expert would be appropriate. Father was permitted to call an expert witness on parental alienation, who testified that an assessment of the children was not only unnecessary but possibly unhelpful to determining whether they were alienated.

---

[9] We also note that Gottlieb spoke with Dr. Steinberg and that Dr. Steinberg's impression of the family informed Gottlieb's opinion and testimony.

46

Finally, father broadly asserts that the court erred in excluding documentary evidence. The only specific argument advanced in his opening brief is that the court improperly excluded the results of a polygraph test, even though it was not prohibited by law from considering it under *In re Jordan R.*, *supra*, 205 Cal.App.4th at page 121. An appellant forfeits a point by failing to support it with reasoned argument. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) Father's assertion, standing alone, is insufficient to establish that the court abused its discretion in excluding the results of his polygraph testing. The absence of any argument with respect to the remaining documentary evidence in the opening brief likewise forfeits any contention of error with respect to its exclusion.

## 2. Substantial evidence supports the court's jurisdictional findings.

### 2.1. Applicable Law

We review the juvenile court's jurisdiction findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Under this standard of review, we determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212; *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other

47

evidence would support a contrary conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 896 [" '[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate' "].) A reviewing court may nonetheless exercise its discretion to reach the merits of a parent's further arguments when "(1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)

Here, the court found by a preponderance of the evidence that counts brought under section 300, subdivisions (b), (c), (d) and (j) were true as amended.

Section 300, former subdivision (b)(1), authorizes the juvenile court to assume jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child . . . ."

48

"A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*Id.* at pp. 601–602; accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 [" 'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.' "].)

Counts b-1 and b-2 alleged inappropriate physical discipline. "Whether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of this parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' [Citations.]" (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.)

"Section 300, subdivision (c) states that a child who comes within the following description is within the jurisdiction of the juvenile court and may be adjudged a dependent thereof: 'The minor is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the

parent or guardian or who has no parent or guardian capable of providing appropriate care. . . .' " (*In re Shelley J.* (1998) 68 Cal.App.4th 322, 329, superseded by statute on other grounds.) " 'The statute thus sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment. [¶] In a situation involving parental "fault," the petitioner must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior.' [Citation.]" (*Ibid.*)

"Under Section 300, subdivision (d), a child comes within the juvenile court's jurisdiction if '[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . or a member of his or her household, or the parent . . . has failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse.' [Citations.] . . . Penal Code 11165.1 sets forth numerous enumerated offenses that constitute child sexual abuse, sexual assault, and sexual exploitation, with references to the Penal Code." (*In re L.O., supra,* 67 Cal.App.5th at p. 241.) "Penal Code section 11165.1, subdivision (a), provides that ' "sexual abuse" means sexual assault or sexual exploitation' and lists a number of offenses that qualify as 'sexual assault or sexual exploitation.' Most of the offenses listed involve physical touching, child

50

trafficking/prostitution, or pornography. Penal Code section 11165.1, subdivision (b)(4), describes 'intentional touching' as '[t]he intentional touching of the genitals or intimate parts . . . of a child, . . . for purposes of sexual arousal or gratification . . . ." The absence of physical evidence of sexual abuse does not preclude a finding of sexual abuse. [Citation.]" (*Ibid.*) "We note that '[a]llegations of child molestation are serious; they merit more than a rubber stamp. With the exception of death penalty cases, it is hard to imagine an area of the law where there is a greater need for reliable findings by the trier of fact. The consequences of being wrong—*on either side*—are too great.' [Citation.]" (*Id.* at p. 243.)

"Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. [Citation.]" (*In re I.J.*, *supra,* 56 Cal.4th at p. 774.)

Whether there was substantial risk of harm to the children may be established based on evidence of prior acts. (*In re J.K.*, *supra*, 174 Cal.App.4th at p. 1438.) Evidence that an adult has a "proven record of abusiveness" can suffice to support a finding of substantial danger to a different minor. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, superseded by statute on other grounds.) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) " '[T]he more severe the type of . . . abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300.' [Citation.]" (*Los Angeles County Dept. of Children & Family*

*Services v. Superior Court* (2013) 222 Cal.App.4th 149, 164.)
"While evidence of past conduct may be probative of current
conditions, the question under section 300 is whether
circumstances *at the time of the hearing* subject the minor to the
defined risk of harm." (*In re Rocco M.*, at p. 824.)

### 2.2. Analysis

Hein testified that, in her opinion, "emotional abuse is the
main aspect of this case." We agree that the court's jurisdictional
findings under section 300, subdivision (c), were supported by
substantial evidence. The children each testified to conduct by
father—including his constant surveillance of the children, his
use of belittling language, and his refusal to respect their bodily
autonomy—that resulted in "severe anxiety, depression, [and]
withdrawal." (§ 300, subd. (c).) Each of the children testified to
thoughts of self-harm when at father's home and anxiety about
returning. Al.G.'s extreme emotional response to testifying is also
indicative of severe emotional distress.

Although we need not consider the remaining counts to
affirm the court's exercise of jurisdiction over the children (*In re
M.R.*, *supra*, 7 Cal.App.5th at p. 896), we will address the
allegations of inappropriate physical discipline and sexual abuse
in light of the serious nature of these allegations and their
possible prejudice to father in future proceedings.

Father does not contend in his opening brief that there is
no substantial evidence to sustain the counts under section 300,
subdivisions (b), (d), and (j). With respect to count b-1, we have
reviewed the video recording of the June 4 incident that father
lodged with this court. Although it does not support aspects of
Al.G.'s initial description of the incident (i.e., father does not
shove Al.G. against the gate, nor does it appear that Al.G. lost

consciousness), the court could reasonably conclude that it does not support father's claim that he put his hand on Al.G.'s shoulder and they both slipped and, instead, reflects an incident in which father acted out of anger and without a genuine disciplinary motive.[10] The children's testimony that father pulled their hair and ears, punched and pushed them constitutes substantial evidence of inappropriate physical discipline under count b-2. We note that father does not assert that, even if the children's testimony was found credible, his physical discipline of the children was genuine, warranted by the circumstances, or reasonable. Likewise, An.G.'s testimony concerning the three incidents in which father put his finger or fingers in his anus, when accepted as true, is substantial evidence of serious physical harm and sexual abuse as alleged in counts b-7 and d-2. Together, this evidence also supports the court's findings with respect to counts j-1, j-2, and j-4.[11]

---

[10] It appears to this court that father hurried to catch up with Al.G., who was about to exit the gate, and forcefully pulled him back. Al.G. then either fell to the ground or was pulled there by father, who was still holding onto Al.G.'s arms. Father leaned over Al.G. and appeared to speak animatedly to him (the video has no audio). As Al.G. was lying on the ground, father continued to hold him with one hand and appeared to shake him. Meanwhile, Al.G. shielded his face with one arm and, when father released him, with both arms. Father then leaned over Al.G. and appeared to speak to him again. He then took out his phone. Al.G. stood and walked back towards the house, and father followed, holding his phone up and ostensibly recording Al.G.

[11] Nothing in the juvenile court's ruling suggests that it placed undue weight on father's strained relationship with the Department employees in making its finding. Father cites *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 290, in which the court of appeal expressed concern that the juvenile court's order removing a teenaged child from

Father instead contends that there is insufficient *credible* evidence. We reiterate that, where the substantial evidence standard applies, "[t]he fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to *extremely deferential review*. [Citation.] [¶] . . . [¶] Fact finders see and hear witnesses. The finder of the facts has a view appellate courts lack. *That view is better*." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*), italics added.) Thus, "[t]he rule is settled that the credibility of a witness and the weight to be accorded his testimony are questions directed to the trier of fact who may accept *all* or *part* of the testimony of any witness it believes to be true or may reject *all* or *any part* which it believes to be untrue. [Citation.] Hence testimony which would support a conclusion contrary to that reached by the trier of fact must be disregarded by this court." (*Estate of Durham* (1951) 108 Cal.App.2d 154, 155; accord, *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 [under substantial evidence standard, the test is *not* the presence or absence of a substantial conflict in the evidence" and "we will

---

her mother's home suggested that "objectively measurable things like disavowing corporal punishment under oath can still be trumped by a parent's having *incorrect ideas* about social workers, government intervention in family life, and the whole juvenile justice 'system' that do not sit well with social workers." The parents in *Jasmine G.* had expressed remorse for their physical discipline of the child and participated in parenting classes and therapy, and the child expressed no fear or anger towards them. (*Id.* at pp. 285–286.) Father has not acknowledged or expressed remorse for the conduct alleged by the children. Although his controlling behavior towards the Department may have impacted the court's opinion of him, other substantial evidence supports the court's jurisdictional findings.

look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing"].) Father's position on appeal presumes that we can consider the testimony of witnesses supporting his position *and* supplant the juvenile court's credibility determinations with our own, neither of which we are at liberty to do. Accordingly, and contrary to father's contention in his reply brief, the Department did not act improperly in focusing on the evidence that supported the court's jurisdictional findings in its respondent's brief.

Although we may ultimately only consider the evidence that supports the court's ruling, we reviewed the extensive record and are aware of inconsistencies between the children's testimony and their statements to social workers and forensic investigators, as well as inconsistencies between one child's testimony regarding certain events and another's. It is evident from the record that the allegations of sexual abuse expanded over time.[12] However, the children were subject to extensive cross-examination and offered explanations for some of these inconsistencies. The court credited testimony from the children that their participation in therapy allowed them to speak more

---

[12] For example, when Al.G. spoke with Figueroa, he denied that father's mouth touched his penis during belly time. However, at trial, he testified that father put his mouth on his penis during belly time and that this occurred around 100 times. Likewise, An.G. informed Figueroa that father had put his hand on An.G.'s butt once. He later told Garza that father had sexually abused him by " 'put[ting] his finger in [An.G.'s] butt' " an afternoon after they had gone boating, and that it had happened twice before but he could not recall the details. At trial, he was able to testify to all three incidents in some detail and there was no mention of the boating trip in relation to these allegations.

openly about the abuse than they felt able to in prior interviews, and Hein's testimony that inconsistencies in the children's stories could owe to the lapse in time in reporting and the children's developmental stage and did not mean their allegations were not credible. Father's assertion that any inconsistencies in the testimony demonstrate "an alignment with [the] alienating Mother" is one interpretation of the evidence. It is not the only interpretation supported by substantial evidence.

The court's rejection of father's alienation theory was not patently absurd. Father contends that Gottlieb should have been entitled to greater weight in determining credibility, as she was an "impartial, independent professional[] with an intimate and percipient knowledge of the entire family dynamic." (Italics omitted.) In *Howard v. Owens Corning, supra,* 72 Cal.App.4th 621, the court rejected the assertion that a trier of fact must accept uncontradicted expert testimony as " 'conclusive.' " (*Id.* at p. 632.) The court explained that, " 'as a general rule, "provided the trier of fact does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [Citations.]" [Citation.] This rule is applied equally to expert witnesses.' [Citation.]" (*Ibid.*) "The *exceptional* principle requiring a fact finder to accept uncontradicted expert testimony as conclusive applies *only* in professional negligence cases where the standard of care must be established by expert testimony." (*Ibid.*) This is not such a case.

Thus, although Gottlieb was the sole expert presented on issues of parental alienation, the court did not act arbitrarily in concluding that Gottlieb's testimony lacked credibility. Gottlieb never spoke with the children or mother and relied on materials provided to her by father, which she ultimately acknowledged

might not reflect the whole clinical picture. She was paid a substantial sum of money by father for her reports and trial testimony. A trier of fact could reasonably question both her impartiality and her intimacy with the facts of the case.[13]

We therefore conclude the court's exercise of jurisdiction over the children was appropriate under the deferential substantial evidence standard of review.

## 3. Bias

### 3.1. Applicable Law

"California's substantial state statutory system for dealing with alleged judicial bias . . . requires those concerned about judicial bias to file in the trial court and, if dissatisfied, to petition for writ of mandate, which is the exclusive means of review." (*Schmidt, supra,* 44 Cal.App.5th at p. 588; accord, *People v. Freeman* (2010) 47 Cal.4th 993, 1000 [" 'Under our statutory

---

[13] Even if we *could* reweigh the evidence and conclude that the accusations of physical and sexual abuse were exaggerated or fabricated, it is not clear that the correct course would have been to dismiss the petition, as father contends. In *In re Christopher C.* (2010) 182 Cal.App.4th 73, the court concluded that a child's willingness to make false allegations was demonstrative of serious emotional damage within the meaning of subdivision (c). The petitioner in *Christopher C.* presented evidence that the parents' conduct during an ongoing custody dispute had caused the children to make false "allegations of sexual and physical abuse," and rendered them "unable to distinguish reality from fiction." (*Id.* at p. 84) There is substantial evidence here that father contributed to the children's awareness of discord between himself and mother, including by recording the children for the stated purpose of protecting himself in court (including when Al.G. was visibly upset and repeatedly asked him to stop) and speaking poorly of mother and discussing her purported brainwashing with the children.

scheme, a petition for writ of mandate is the *exclusive* method for obtaining review of a denial of a judicial qualification motion.' [Citation.]"].) Father moved to disqualify the juvenile court under Code of Civil Procedure section 170.1 and filed a writ petition challenging the court's order striking his disqualification statement, which a panel of this court summarily denied. "Because writ relief is the only authorized mode of appellate review for peremptory challenges, [the Court of Appeal's] decision, in contrast to routine summary denials, is binding on the parties, and cannot be revisited on a subsequent appeal." (*Frisk v. Superior Court* (2011) 200 Cal.App.4th 402, 415; accord, *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 849–850 [appellate court could not "revisit whether the judge should have disqualified himself" after it had summarily denied writ petition].)

Thus, we may not consider any statutory claim of bias. Rather, the "only avenue for [father's] bias argument is the due process clause, which sets an exceptionally stringent standard." (*Schmidt, supra,* 44 Cal.App.5th at p. 589.) "It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation. [Citation.] The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial." (*Ibid.*)

The assertion that bias is demonstrated where the court uniformly believes one party's evidence and rejects the other party's evidence "is contrary to the great weight of authority. For example, in *McEwen v. Occidental Life Ins. Co.* (1916) 172 Cal. 6,

58

11, it was held that numerous and continuous rulings against a litigant, even when erroneous, form no ground for a charge of bias or prejudice. This rule is tenable in both a judicial and an administrative context. . . . As the Supreme Court declared, 'total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact.' [Citations.]" (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 795–796.) Thus, "adverse or erroneous rulings, especially those that are subject to review, do not establish a charge of judicial bias." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112, disapproved in part on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

" '[W]hen the state of mind of the trial judge appears to be adverse to one of the parties but is based upon actual observance of the witnesses and the evidence given during the trial of an action, it does not amount to that prejudice against a litigant which disqualifies him in the trial of the action. It is his duty to consider and pass upon the evidence produced before him, and when the evidence is in conflict, to resolve that conflict in favor of the party whose evidence outweighs that of the opposing party. The opinion thus formed, being the result of a judicial hearing, does not amount to [improper] bias and prejudice . . . .' [Citation.]" (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1219–1220.)

### 3.2. Analysis

Father cites rulings that were reversed following writ petitions as evidence of the court's bias against him. He also argues that the fact that the court limited his witnesses and documentary evidence after the adverse rulings on his writ petition further demonstrate the court's bias, as does the fact

59

that the court overruled father's objections a greater percentage of the time than it overruled the objections of the other parties. Father does not attempt to demonstrate that all or most of his overruled objections were meritorious, or that the objections of other parties were sustained despite being unfounded. Statistics alone are insufficient to persuade us that the court acted in a clearly biased manner.[14] Even if the juvenile court's rulings were erroneous or an abuse of discretion in part, "numerous and continuous rulings against a litigant, even when erroneous, form no ground for a charge of bias or prejudice." (*Andrews v. Agricultural Labor Relations Bd.*, *supra*, 28 Cal.3d at pp. 795–796.)

Father further contends that the court's suspension of his visitation with the children demonstrates bias. However, the court's order was not "sua sponte," as he claims. The Department requested that visitation be temporarily suspended while the children testified and the court issued the order, explaining that "[Al.G.] was uncontrollably sobbing for over 30 minutes yesterday, was again crying today, describes having nightmares of father, anxiety, depression, suicidal thoughts, is on medication or has been for the last three to four weeks. "The court clearly believed the order was necessary to protect the children's emotional wellbeing. To the extent its order also suggested an adverse frame of mind against father, it was " 'based upon actual

---

[14] At the time of trial, the children were all under the age of 14. The court had an obligation to "take special care to protect [them] from undue harassment or embarrassment, and to restrict the unnecessary repetition of questions." (Evid. Code, § 765, subd. (b).)

60

observance of the witnesses.' " (*Moulton Niguel Water Dist. v. Colombo, supra,* 111 Cal.App.4th at p. 1219.)

Following a writ petition by father, this court ordered that the juvenile court must hold a properly noticed hearing within three weeks of the date of its order on the issue of father's visitation with the children. Father asserts that the court's bias is further demonstrated by the fact that it would not move the hearing on visitation to accommodate an emergency surgery. When father's attorney informed the court that father would be having surgery on the date that the hearing was set to take place, the court advised her that it intended to comply with the court of appeal's order, which it understood to require that a hearing be completed within three weeks, and that father should seek a continuance from this court. The juvenile court set the hearing two days after father's surgery to accommodate his request to attend the hearing remotely, while still complying with its understanding of this court's order. When father's counsel later informed the court that there had been complications and father would be unable to participate, the court stated: "[I]f it was up to me, I'd find good cause to grant a continuance; but it's not up to me. I'm following the mandate of the Court of Appeal." The court reiterated that it had advised counsel to seek an extension from the court of appeal. This court's clarification that there was no deadline by which to conclude the hearing on visitation came after the children's therapist, Dr. Stephen Poulter, had testified for several hours. We do not find the court's handling of this issue to be arbitrary or an abuse of discretion.

We are also not persuaded that the juvenile court's denial of father's request to have Dr. Steinberg and Barach testify at the visitation hearing was indicative of bias. The court's conclusion

61

that the children's therapist was in the best position to opine on whether visiting father during their testimony would be detrimental to the children's mental health was reasonable. As discussed above, Dr. Steinberg and Barach were neutral therapists whose intended role was to facilitate the children's visitation with father. Dr. Steinberg never met the children, however. And although Barach met with the children on at least four or five occasions, father identifies no evidence that she was as familiar with their emotional wellbeing as Dr. Poulter, who had been providing one-on-one therapy to the children on a weekly basis for months. Thus, we are not persuaded that father had met the exceptionally stringent standard for demonstrating bias.[15]

The court's accommodation of requests from other parties and counsel for time off trial also fails to support father's claim of bias, as father presents no evidence that the other requests could have potentially put the juvenile court at risk of violating an order of this court. Indeed, father's and his counsel's requests for days off were granted in other contexts.

Finally, father contends that the court's questioning of certain witnesses was inappropriate. As a general matter, a court may appropriately question witnesses, particularly in a bench trial. (See *People v. Randal* (1964) 226 Cal.App.2d 105, 109–110 [court in bench trial "had both the right and the duty to satisfy [itself] as fully as possible on the credibility of the respective witnesses"].) Father cites the supplemental clerk's transcript

---

[15] Similarly, we reject father's contention that the court's exclusion of other witnesses and how it handled one of mother's witnesses showed bias.

rather than the trial transcript in support of these claims. Without full context, we are unable to judge the reasonableness of the court's questioning or interjections. We have reviewed the trial transcript in its entirety and did not perceive any inappropriate interference in the proceedings by the court.[16]

4. **The juvenile court was the proper venue to resolve the allegations of the petition.**

Finally, we agree with the Department that father's contention that this matter was more suited to family court is unsupported. " 'The juvenile courts must not become a battleground by which family law war is waged by other means . . . .' But where the Department is able to prove that dependency jurisdiction is warranted, these concerns must give way to the primacy of the dependency court jurisdiction and its special role." (*In re Nicholas E.*, *supra*, 236 Cal.App.4th at p. 466; see also *In re Roger S.* (1992) 4 Cal.App.4th 25, 30–31 ["Although both the family court and the juvenile court focus on the best

---

[16] In the portion of father's opening brief concerning the court's purported bias in admonishing his counsel, a number of citations to the record are incorrect or impossible to follow. For example, he cites "4RT 5" and "6RT 5," even though the fourth volume of the reporter's transcript contains pages 901 to 1,200 and the sixth volume contains pages 1,501 to 1,800. "If a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the argument deemed to have been waived." (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.) Accordingly, contentions supported by incorrect record citations are forfeited. Even if father had provided appropriate citations, one of his arguments is that the court incorrectly admonished his trial counsel for his tone with a witness "when, in fact there were no tone issues at all." We are not in a position to decide such issues on a cold record.

interests of the child, the juvenile court has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances."].) The court's jurisdictional findings were supported by substantial evidence. "The long and ongoing family law proceeding between [f]ather and [m]other does not change the analysis under section 300 here." (*In re D.B.* (2020) 48 Cal.App.5th 613, 622.)[17]

---

[17] The heading in father's opening brief contends that "alternatively, the court should have kept the case open for services," yet advances no arguments in furtherance of this claim. He therefore forfeits this point. Even if it were not forfeited, we perceive no error. The children remained with their custodial parent; father was not entitled to reunification services and termination of jurisdiction was appropriate. (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212.)

## DISPOSITION

The court's jurisdictional findings and disposition orders terminating jurisdiction are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ADAMS, J.